# INVESTIGATION REPORT

**CASE:**          *Stirling v. Hendrix*
                   **Case No. 3:20-cv-00712-SB**

**ATTORNEY:**      **FPD Lisa Hay**

**INVESTIGATOR:**  **William J. Teesdale, Chief Investigator**

**RE:**            **FCI Sheridan Inspection**

**DATED:**         **September 17, 2021**

## Background

On September 17, 2021, I attended a court-ordered FCI Sheridan inspection as one of the four authorized Federal Public Defender (FPD) representatives, pursuant to Judge Beckerman's amended inspection order of September 15, 2021.

I have been conducting investigation work for the FPD office for about 28 years and am currently the FPD Chief Investigator. I am also a member of the bars of Oregon and England. During my work for the FPD I have visited many jails and prison facilities in the State of Oregon, as well as out of state correctional facilities. Over the years, I have talked to hundreds of corrections inmates, both pre-trial and post-trial. I have attended several tours of FCI Sheridan and many of the regular meetings that have occurred between the FPD and FCI Sheridan leadership. I have conducted many legal visits to FCI Sheridan mostly to meet with clients and sometimes witnesses.

I was directly involved in investigation work relating to the detention of hundreds of immigrants who were detained at Sheridan in the summer of 2018. That work included interviewing many detainees regarding conditions of confinement issues.

## Pre-Inspection Meeting

The inspection team met at the lobby of the FCI and went over protocols for the visit and reviewed a proposed schedule provided by the BOP. The inspection began promptly at 8:00 a.m. at the FCI and concluded at approximately 12:30 at the FCI Camp.

During the inspection, I took several still pictures on a Canon DSLR camera of areas of FCI Sheridan that were authorized by the inspection order showing relevant areas of the prison that did not include BOP staff or recognizable inmates. I also took still images using a smaller Canon point and shoot camera that we identified as the "objection" camera which was used to take pictures that included inmates in cells, in housing areas, and the gym. The BOP assigned SIS

**PAGE 1 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 1 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

officer Carter who assisted me in the process of taking pictures with both cameras and in making sure that the images did not include pictures of BOP members of staff.

**Federal Public Defender Inspection Team**

Lisa Hay, Federal Public Defender
Mark Loveless, M.D. – Infectious Disease Consultant
Michael T. Puerini, M.D. – Corrections Health Consultant
William Teesdale, FPD Chief Investigator

**Government and BOP representatives**

Jared Hager, AUSA
Amy Potter, AUSA
Alison Milne, AUSA
George Cho, BOP General Counsel
Assistant Warden Cooper, BOP
Farrah Silver, BOP
Dany Rogowski, BOP
SIS Carter, BOP

**FCI Inspection**

After processing in through FCI security we began our inspection of the FCI at the 1B housing unit, which is an RDAP (Residential Drug and Alcohol Program) unit. The unit is a two-tier triangular-shaped unit with the significant majority of inmates in locked cells with a few inmates out conducting cleaning duties. One of the inmates spraying disinfectant told one of the inspectors that this had not been done before and was just being done because of the inspection. The unit generally appeared clean and well maintained, although empty of inmates in the communal area. There is a central area with stacked chairs and fixed tables with several TV monitors that were on, pointed towards the cells, and displaying various channels. Some Health Services staff were doing a round during our visit and we introduced ourselves to them. They explained that they were going cell-to-cell with medications because inmates were locked in. I took some photos of the shower area (there are 8 total showers in the housing area).

PAGE 2 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB

**Exhibit 1 - Page 2 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



FCI Housing Unit 1B and Example Showers

During our walk-through of 1B, one of the inmates yelled out loudly about the conditions and Lisa Hay talked to the person through his cell door (cell 128) and asked him not to yell. The person complied with this request and said that he had not been able to have a shower in two days and had not been tested for COVID-19. The inmate gave permission for a photo to be taken of his cell through the window in the door, which I accomplished using the objection camera.

Other inmates on the top tier called out, and Ms. Hay went to those doors as well. She reported those inmates said their tier had been skipped by the guards, and they had not had a shower in almost a week.

I was able to take several pictures of an unoccupied cell (203) in this unit, which was a double bunk cell with a metal two-tier bed frame and rolled mattresses. The cell included an open toilet, mirror, shelf, and cupboard. The cell appeared clean, apart from one of the cell vents.

A person in cell 201 said that the mechanical room had a fire yesterday and had caused a problem with the HVAC. The mechanical room was locked and there was no maintenance person readily available to open the door. BOP personnel offered to call maintenance and open the door but we declined so as not to delay the inspection. Whatever the issue was it had been repaired.

**FCI Unit 3A – COVID Isolation Unit**

At approximately 8:40 a.m. we walked from Unit 1B to 3A. The BOP staff had recently discovered an outbreak of COVID in 3A and had moved all non-COVID prisoners to other units and then transferred COVID positive inmates from the gym, which had reached its authorized capacity of 60. Before entering the unit we stopped at a PPE station and put on a gown, face shield, and gloves in addition to the N95 masks that we were using during the visit.

**PAGE 3 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 3 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



FPD Inspection Team at PPE Area

In this unit, I took some general pictures of the unit, which appeared to be clean. Cell 103 had complaints written on three envelopes protruding from the cell door. I took clearer pictures on the objection camera. The primary complaint related to lack of access to showers and the lockdown.

I spoke to one of the people through the door in cell 111, who was very upset and concerned about the lack of treatment for high blood pressure. That inmate said: "these guys are going to kill us." I explained to the person in cell 111 that we were not able to conduct detailed interviews of people about specific issues but he could contact our office and explain the issues in detail.

Many inmates pressed their faces to the narrow window in their cell door, either to watch the walk-through inspection or to call out with their concerns.

I looked at the shower facilities and took a picture of a double shower unit showing one shower out of order in the unit. These housing units are set up uniformly, so there are generally 8 showers available in the housing unit. It was clear to me from information shouted out from people in their cells, and from correspondence received from several inmates, that the problem was not the lack of available showers but the amount of lockdown time causing a problem with people being able to shower regularly.

**PAGE 4 OF 19 – INVESTIGATION REPORT RE:** *STIRLING v. HENDRIX*, **CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 4 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



Shower Out of Order

One of the BOP facilities personnel assisted me in looking at the HVAC room and filtration system. I took several pictures of the room and was told that the HVAC filters are changed on a regular schedule which is normally every 3-6 months but they are changing them more regularly because of the COVID pandemic. The HVAC system appeared to be functioning correctly and was maintained in good condition according to the information provided.

I also took a picture of the unit's mailbox, which was locked and attached to one of the walls. One of our inspectors had heard from a prisoner that the only way that anyone could request medical care was through a request placed in the mailbox. There is also a system for making a medical request by computer but medical staff were reportedly not responsive to those requests and would tell inmates to place a request in the general box. That box received all inmate requests and was not limited to medical matters and is not staffed by medical personnel but by guards. One of the consistent problems mentioned throughout the inspection was the lack of access to medical care.



**FCI Gym**

We finished our inspection of the COVID housing unit and moved to the FCI gym. I took several pictures of the gym on the objection camera. The room is a large gym with a high ceiling

**PAGE 5 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 5 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

and large-scale ventilation ducts, similar in size to a large high school gymnasium.  The room was set out with single bed cots, spaced at approximately 6 feet intervals.  I could not tell the number of occupants but approximately 20-30 people, most of whom were lying on their beds and were obviously quite sick.  There were others less badly impacted who briefly spoke with Ms. Hay.  I moved around the gym area and took some pictures on the objection camera.  The gym area was generally clean and tidy with some TV's on at the far end.  Two people were involved in a game of chess.  I spoke to a couple of people on cots about the inspection and commiserated with them about COVID.

On the day before the inspection, we were informed by AUSA Amy Potter that the COVID positive numbers had increased significantly, so a number of people had to be moved from the gym, which was at capacity (60), and were moved to Housing Unit 3A (see above).  BOP General Counsel George Cho gave me a list of 25 people who had been moved from the gym before the inspection and who were now in 3A.

BOP personnel had also taken pictures of the gym before those people being moved and Mr. Cho told me that they were working on getting those photos to us (during a telephone hearing about this issue Magistrate Judge Beckerman requested that the FPD be provided with those pre-inspection gym photographs).  We received 11 images in discovery from the government on September 29, 2021, showing the gym prior to inspection and one example is below:



FCI Sheridan Gym Prior to Inspection, Government Discovery USA000011 – Blur added

I took some non-objection photographs of one of the two available restrooms (the other was occupied) and the only shower area, which had been converted from a closet.  In my opinion, the bathroom and shower facilities were insufficient for the needs of such a large number of sick people.  Federal Public Defender Lisa Hay told me that some of the people she spoke to reported

**PAGE 6 OF 19 – INVESTIGATION REPORT RE:** *STIRLING v. HENDRIX*, **CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 6 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

difficulty in getting some of the sick COVID patients to the shower facility because they are infirm or in a wheelchair and getting to the shower requires going up the gym stairs. We have also received reports of problems getting medical care for those in the gym, and lack of ready access to drinking water. Inmates previously reported that the only available water for all of the people housed in the gym was through the small sink in the bathroom, pictured below, where inmates also washed their hands.



FCI Gym, Toilet and Shower Area

When asked about access to drinking water, the BOP staff showed us two large, plastic water vessels that were awaiting a refill in an outside area. There were no drinking cups visible. The water containers were a new addition according to information we received from inmates after the inspection.

**FCI Medical**

At approximately 9:25 a.m. we departed the gym and moved to FCI Health Services and were introduced to some of the staff and shown around by Officer Morgan. We looked at the medical examination rooms, where I took photos, as well as the trauma room and the suicide watch area. There was one person under watch in the suicide watch room with a volunteer on watch. One of the Health Services staff said that there has been an increase in the number of suicidal patients since the COVID outbreak and they are in the process of increasing the number of available rooms so additional inmates can be placed on watch.

We received a letter from one of the suicide watch volunteers after the visit, raising a concern that it is not possible to dim the lights, even a small amount, for those on suicide watch, making it difficult to differentiate between day and night.

The inspection team was shown the radiology room, well-equipped dental treatment room, pharmacy, and pill line. Health staff said that under ordinary circumstances there are two pill lines per day and the pills are distributed in pill bottles and not blister packs. Health staff were visiting cells rather than running a pill line, however, during the lockdown.

PAGE 7 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB

Exhibit 1 - Page 7 of 19
Stirling v. Hendrix, 3:20-cv-00712-SB



FCI Health Services, Trauma Room and Dental Facility

The information the inspection team received during the visit and directly from inmates before and after the visit is that there is a problem with obtaining access to these necessary services because inmates are in lockdown or quarantine all day without access to the recreation yard or usual facilities and programs.  Because inmate's medical requests are not responded to promptly, or not responded to at all, there is an access to care issue that is not being addressed.

**Secure Housing Unit (SHU) and Visiting Room**

The inspection team moved to the SHU area where I took a few photos of cell hallways.  There were 88 inmates in the SHU on the date of inspection.  We walked along the cell hallways and spoke to some inmates.  One mentioned to Officer Carter that he had not received any stamps or commissary in three weeks.  Officer Carter passed this information on to the SHU staff.  That same inmate said he only was able to shower every other day.  I also took a picture of the SHU law library and of the cement recreation area, which had three inmates using it at the time.



SHU Cell Corridor and Exterior Recreation Area

**PAGE 8 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 8 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

After a brief look at the empty visiting room, which is allowing limited visiting on Saturdays and Sundays, we moved to the FDC.

## Federal Detention Center

We began our inspection of the FDC at approximately 10:25 a.m. in the visiting area where I took a few non-objection photos. I was familiar with this area from many previous visits since attorney visits take place in one of four rooms located in this area. Each of the individual rooms is now also set up with video conferencing capability.

## FDC Housing Area J1

This is a two-tier detention center housing area with mostly double-bunked cells, communal showers, a phone room, and a library room with two book carts. Most of the detainees were in lockdown in their cells with a small cohort of 10 – 20 inmates out of their cells. I was asked to take some pictures of the ceiling air vents in the unit, which did not look clean



FDC J1 Housing Tier and Example Vent

One inmate, J.D., who was one of the small number of inmates out of his cell, contacted me and said that he has problems with his leg and a hernia with "blood coming out every day." J.D. said that the doctor only comes in once a month and that he did see a cardiologist last month but has received no treatment or follow-up care. I took objection camera photos of J.D.'s swollen leg. I also took photos of some other celled in people who complained of medical problems.

I was asked to speak to JC in cell 139, who said that he is pre-diabetic and that he has a "messed up" hernia for which he had a planned corrective surgery that was then postponed.

**Exhibit 1 - Page 9 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

I also spoke with Mr. G. in cell 117, who is a Spanish speaker.  Mr. G.  showed Dr. Puerini his leg, which was visibly swollen and had some color change.  Dr. Puerini told me that the leg swelling was probably chronic because of the obvious color change.

I spoke briefly with C.H., who told me that he had been in quarantine for 35 days, that he has been sleeping just on a mattress and has prostate cancer.  He wanted to know about the lawsuit.

I spoke briefly with J.F. and later received more information from him by phone on Friday, September 24, 2021.  J.F. told me that he was quarantined in J1 in a single cell for 21 days even though already fully vaccinated.  When he was moved to a double cell, only the top bunk was available, which he cannot get into because of medical problems, so he sleeps on a mattress on the floor.

J.F. arrived in J1 on a Thursday and first got any time out of his cell on the next Saturday when he got 15 minutes for a shower.  On Mon, Wed and Fri, J.F. would get out of his cell for 30 minutes a day.  For the first week, J.F. had no access to any books.  When J.F. did get access to the library he found that the few available books had parts missing or were those that no one wanted to read.  J.F. sent five "cop-outs" for Tylenol to help with chronic pain in his knees and ankles but received no response.  Eventually, he was able to go to the medical clinic in J1 and was told he could order Tylenol through the commissary, but J.F. had no funds in his commissary account at that point.  Eventually, the nurse did order him one bottle of Tylenol which he received last Sunday.  J.F. said that the nurse did order various tests including X-rays and blood tests but that appointment will not happen for about a month, according to the nurse.

J.F. said that on Thursday (9/23/2021), the policy changed and he was now allowed out for 4 hours per day and this applied to everyone who was not on quarantine.  He was also allowed about an hour outside in the yard.  J.F. said that they now allow 50 people out at a time, all wearing masks, either in the morning or the afternoon, which is a big improvement.

Officer Carter explained the use of the "Quarantine" notices on the cell doors of some cells.  These did not relate to COVID infection, but were for inmates who were either arriving or about to leave the unit for another destination.



Example Quarantine Notice and J1 Showers

**PAGE 10 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 10 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

One of the J1 cells had been converted to a small medical room at the end of one of the lower cell corridors.  The room was locked but I took a photo through the window.



J1 Medical Room

On October 1, 2021, I received a call from JC in the FDC J1, who told me that he has been at the FDC for about 2 months and he has sent at least 15 medical cop-outs in the inmate correspondence box, or directly to staff, to get medical treatment.  Mr. Carroll has requested medical treatment for gout, a hernia, an ear infection, prescription medication for psoriasis, and morning high blood pressure monitoring visits, none of which he has received.  JC has received only one response, which he received yesterday relating to his ear infection and setting up an appointment relating to that.  I read this paragraph back to JC and he agreed that it was accurate and authorized me to add it to my report.

**FDC Housing Unit J2**

At 11:05 a.m. our inspection tour moved to the J2 housing area, which is another detention housing unit that differs from J1 in only fairly minor ways.  One of the differences is that there is an open vent that connects J2 to the J3 isolation area where COVID-positive inmates have been regularly held.  One concern raised by people in J2 is the risk that COVID could be transmitted through the vent between the two units.

**Exhibit 1 - Page 11 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



J2 Entrance, Interior View of J2 and Vent Connecting J3

The following photograph is a closer view of the J2 side of the vent connecting J2 to J3:



During our J2 tour I was contacted by C.G., who said that he had a rash that was not improving and for which he had only been given hydrocortisone. He reported that he had not seen a doctor in 14 days and also had some issues "throwing up blood" that he is concerned about.

I was also contacted by J.B. in cell 115, who allowed me to take photographs of his cell with the objection camera and non-objection camera to show an occupied cell. J.B. requested my business card, which I provided him after receiving permission from Mr. Cho. J.B. told me that he was having great difficulty receiving medical care, so I asked him to follow up with me at a later date.

J.B. called me on Friday, September 24, 2021, and relayed that he transferred in from Pahrump, NV on specific medications as part of the MAT (Medically Assisted Treatment) medication

PAGE 12 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX,* CASE NO 3:20-cv-00712-SB

Exhibit 1 - Page 12 of 19
Stirling v. Hendrix, 3:20-cv-00712-SB

program, which is reportedly approved by the BOP. J.B. said that he has requested that he be put on MAT in Sheridan via "cop-out" 10 times but has only received one response back. J.B. has sent messages to Health Services by computer but has received a response saying that he can only request medical care by a paper cop-out, but when he does that the medical staff does not respond. J.B. said that when he did discuss this with the nurse she was "nasty, disrespectful and would not listen." J.B. said that his impression is that the leaders don't care and because "they don't give a shit" and the inmates are "not worth anything" then that is the attitude shown by many staff. J.B. said that he has sent copies of all of his medical requests to me in the mail.

J.B. said that everyone has been on lockdown in J2 (except orderlies) which resulted in a two-day hunger strike that ended on September 23 after a meeting between inmate leaders and the Sheridan leadership. The hunger strike resulted in FDC inmates being allowed out of their cells four hours per day, divided into a morning group and an afternoon group. I reviewed these two paragraphs with JB in a phone call on September 30, 2021 and he agreed the statements are accurate and truthful.

Continuing with the inspection, I took additional photos of the J2 Housing area on both the objection camera and some on the non-objection camera of the library room, computer room, and cell that was converted into a medical room.



J2 Medical Room

During our J2 visit, we saw lunch being delivered to the Unit and I took a couple of photos of that day's lunch.

**PAGE 13 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 13 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



## J3 Isolation Unit

At about 11:30 we briefly toured the J3 isolation unit.  The unit contains a single corridor of cells on either side.  We looked in one of the individual cells and I took some photographs.  At the end of the corridor is the vent that connects J3 to J2.  There were no imates housed in J3 during our tour, but our office had been informed that COVID positive inmates had been previously housed in that area.



This is the end of corridor vent between J3 and J2:

**PAGE 14 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 14 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**



## FDC Health Services

At about 11:30 a.m. we inspected the FDC Health Services section.  I took several photos of the trauma room, examination room, x-ray room, and pharmacy.  The equipment in the rooms appeared to be clean, well maintained, and in good condition.  One of the nursing staff showed us around the facility and explained that everyone coming into the institution received a rapid covid test, which is processed in health services.  Incoming inmates are quarantined away from other inmates until they are cleared.  Two example photographs below show Dr. Puerini inspecting the trauma room and a view of the x-ray room.



## FCI Camp

From noon till approximately 12:45 p.m. we inspected the Camp which was housing about 330 inmates on the day of our visit.  The security conditions at the Camp were much less strict and

PAGE 15 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB

**Exhibit 1 - Page 15 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

the inmates appeared more relaxed.  We toured the Camp medical facility (which appeared clean, well equipped and maintained, and empty), an example housing unit that was an RDAP unit (although group activities were currently stopped due to Covid).  We also visited various of the activity rooms (art room, education room, and law library), all of which were currently closed because of the pandemic.  We toured the dining room, which was closed for indoor dining.  Inmates receive lunch on a grab and go system, which allows inmates to come to the dining hall, pick up their box lunch, and take it back to their housing unit to eat.



General Overview of Camp Setting



FPC Health Services and Notices to Inmates Re Costs and Restrictions

Exhibit 1 - Page 16 of 19
Stirling v. Hendrix, 3:20-cv-00712-SB



FPC Example of Housing Showers

Recreational facilities were closed during our visit, although we were told that these facilities are open some of the time when staff are present:



FPC Example Recreational Areas and COVID Restrictions Notice

We concluded our inspection tour at the Camp entrance.  Ms. Hay thanked BOP officials for the well-organized tour and also voiced her concern about the amount of time that inmates are kept in their cells. She suggested that vaccinated inmates be housed together and allowed more freedom, including time outside.  At the end of the tour, I passed the objection camera to AUSA Jared Hager.

**Conclusions and Post Inspection Tour Excerpts of Inmate Correspondence**

The inspection tour was well organized and managed by BOP Sheridan staff, who were also cooperative and reasonable about answering inspectors' questions about the facility and its operations.  The inspectors were allowed reasonable latitude in talking to both inmates and staff, given the restrictions imposed by the court in not allowing more detailed interviews.  The facility was generally clean (some of the cleaning was done in preparation for our visit) and appeared well maintained, apart from some issues with specific vents that could be cleaned or improved with additional filters (vent between J2 and J3).  The Health Services facilities appeared to be

**PAGE 17 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB**

**Exhibit 1 - Page 17 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**

clean and in good condition. One of the inspectors remarked that the FCI dental room was the best he had seen.

The inspection, together with additional information received from Sheridan inmates pre- and post-inspection did reveal some consistent problems expressed by inmates and discussed below. I do not raise these concerns to criticize FCI Sheridan and BOP employees who are doing a difficult job managing a large federal facility during a pandemic, but to raise awareness of problems so that appropriate solutions can be considered.

### 1. COVID Related Lockdown

Almost all of the FCI and FDC inmates have been in varying states of lockdown off and on since the start of the pandemic. This means that, for the last 18 months, many inmates have been locked in double bunk cells (some quarantined alone) for weeks, with only 15-30 minutes out time each day, or sometimes every other day. When the lockdown restrictions are lessened, inmates still report getting out of their cells for only 4 hours per day. This has caused great difficulty accessing appropriate health services, contacting family members, getting exercise, and participating in BOP programming. Long-term isolation can lead to a significant increase in mental health problems and despair.

I understand that J1 and J2 Units at the FDC are now allowing pretrial inmates out up to 4 hours per day and some time outside in the recreation yard, which has been very well received. The letters we have received from the FCI indicate that inmates are still only getting out of their cells for a very short time. For example, a letter received from an inmate on September 20 is excerpted below:

> Just Being punished Because of covid and are all Hungry, and mentaly sick from the constint lockDowns w/no interaction w/ people, programing, recreation we get and have nothing no voice Just sickness and stress

Inmates arriving at FDC Sheridan report being quarantined in single cells for extended periods (21 days in one case, 35 days in another case). These are long periods of isolation for inmates and without access to recreational activity.

### 2. Lack of Access to Medical Care

Several inmates who contacted us during the inspection raised concerns about the lack of access to medical care. This conforms with numerous complaints received at the FPD during this last year about the poor quality and lack of access to medical care. *See* Declarations of Investigator Courtney Withycombe. We have been told that inmates making electronic requests for medical care sent directly to Health Services are informed that they must make a paper "cop-out" request.

PAGE 18 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB

Exhibit 1 - Page 18 of 19
Stirling v. Hendrix, 3:20-cv-00712-SB

Those requests can be made by placing a request in a mailbox that includes requests for other non-health services and is staffed by guards, not health services personnel.

Some inmates asked me to take pictures of medical problems they are having and to try to help them obtain medical care. We have received many letters from inmates discussing a lack of access to medical care and that some of those concerns appear to be potentially serious. For example, we received a letter from an FCI inmate on 9-21-2021 – an excerpt of the letter is shown below:



furthermore, I have a large lump in my testicles and gut that is becoming more painful and larger as more time passes, I have complained since July 24th and have not even been evaluated. I worry I could die,

Many COVID positive patients have been quarantined in the FCI gymnasium. When we toured the gym, the number had been reduced from 60 inmates the day before the visit because Sheridan discovered a large number of additional COVID positive inmates and they could no longer fit everyone in the gym. When we toured the gym there were probably 25 – 30 occupants, which seemed quite full, even with the reduced number. The room itself is large, with a high ceiling and lots of light but access to the only toilets and shower is upstairs and would be very difficult for anyone with mobility issues or someone who is very unwell. Inmates reported there is no system in place, other than yelling, to request immediate medical help if a COVID positive inmate suddenly suffers a downturn.

A different potential problem exists for those COVID positive inmates quarantined in housing unit 3A who are out of sight of BOP staff and could have a sudden medical deterioration caused by COVID and be unable to reach their call button. If such inmates are housed alone, then they would not be able to ask their cell mate for assistance.

3. **Lack of Programming and Access to BOP Facilities**

When we toured the FPC, the less restrictive conditions were obvious and led to our receiving far fewer concerns from Camp inmates. It was apparent that most of the Camp programs were not operating on a normal schedule and none appeared to be open during our Inspections.

We received a letter from one Camp resident who expressed that inmates in the Camp are being forced to work 15 hours per day preparing meals because the FCI kitchen workers have gone on strike. That inmate reports getting up at 4:00 a.m. and working until 7:00 p.m. and that 17 inmates are doing the work that is normally done by a crew of 35, leading to exhaustion.

Inmates at the FCI who are in lockdown most of the day are unable to do any BOP programming and have very limited opportunities to do anything except watch TV (which requires the purchase of a radio) and read books, which are in limited supply, according to one inmate.

PAGE 19 OF 19 – INVESTIGATION REPORT RE: *STIRLING v. HENDRIX*, CASE NO 3:20-cv-00712-SB

**Exhibit 1 - Page 19 of 19**
**Stirling v. Hendrix, 3:20-cv-00712-SB**